389 So.2d 1295 (1980)
STATE of Louisiana
v.
Ernesto C. SALAZAR.
No. 66747.
Supreme Court of Louisiana.
October 6, 1980.
Dissenting Opinion November 24, 1980.
*1296 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott J. Reeves, Clarence McManus, Asst. Dist. Attys., for plaintiff-appellee.
Ronald P. Herman, Metairie, for defendant-appellant.
WATSON, Justice.
Defendant, Ernesto C. Salazar, pled guilty to possession of cocaine with intent to distribute. LSA-R.S. 40:967. A sentence of five years at hard labor was suspended, and defendant was placed on five years' conditional probation.[1] Defendant appeals the trial court's denial of a motion to suppress evidence. State v. Crosby, 338 So.2d 584 (La., 1976).
Salazar had been noticed and questioned by Dade County Sheriff's deputy William Johnson at the Miami Airport. Johnson telephoned police officers in New Orleans who stopped Salazar upon his arrival at Moisant Airport. Defendant consented to the search of his luggage by Shep, a trained narcotics detection dog. After a positive response by Shep, a search warrant was issued. Almost two pounds of cocaine were found in Salazar's luggage. The affidavit in support of the search warrant recites the following facts.
On Tuesday, February 13, 1979, Sergeant G. Schwabe and Agent F. Whitehead received *1297 a phone call from Detective Bill Johnson of the Dade County Sheriff's airport detail. Schwabe spoke to Johnson while Whitehead listened on an extension. They were advised that a white male named Ernesto C. Salazar had entered the Miami International Airport carrying limited luggage. He appeared hurried, nervous and apprehensive. Salazar first approached the National Airlines ticket counter and then went to that of Northwest Orient. Salazar looked around constantly. When asked by the Northwest Orient employee what name his reservation was in, Salazar stuttered, hesitated and then gave the name Frank Pola. Salazar checked two pieces of baggage, a shoulder bag, navy blue trimmed in tan, and a fabric suit bag. Johnson, who has extensive experience with drugs at the airport, identified himself to Salazar as a police officer and asked if Salazar would mind talking to him, which Salazar agreed to do. Salazar identified himself to Johnson from a Louisiana driver's license as Ernesto C. Salazar, but had no answer to the question of who Frank Pola was. The Miami address Salazar gave to Johnson was in an area of known drug traffic and his Miami telephone number was fictitious. Salazar showed and surrendered to Johnson a small amount of marijuana in his purse. Johnson advised Salazar that he would not charge him with possession. Salazar refused, however, to have his baggage searched and remained nervous when boarding his flight. Johnson then checked with the airline and learned that Salazar's reservation under the name of Frank Pola was made in St. Petersburg, Florida, at approximately 1:30 P.M. the same day. The call back number on the reservation was fictitious. Salazar was described as being a white male, approximately five feet five inches tall, weighing one hundred forty pounds with brown hair and eyes and a mustache. He was wearing blue jeans and a checked shirt, and carrying a small leather purse. He was scheduled to arrive in New Orleans aboard Northwest Orient Airlines flight number 185 at approximately 4:28 P.M. Schwabe had Agent R. Dennis and Shep stand by for arrival of the flight. Schwabe and Whitehead observed a nervous exit from the plane by Salazar. Looking around constantly, Salazar claimed his baggage and then started to leave the airport, whereupon they approached him and identified themselves as police officers. Salazar began to physically shake. When asked for his identification and airline ticket, Salazar advised that he had thrown the ticket away, but said he was flying under the name of Ernesto Salazar. The agents had verified that there was no reservation on flight 185 for Salazar and asked Salazar if he would consent to a search of his baggage. He refused, but agreed to permit Shep to smell his luggage. K-9 dog Shep is trained to locate cocaine, heroin, marijuana, hashish, PCP and methaqualone powder but cannot differentiate between them. In the baggage claim area Shep, who had located drugs in baggage in the past, sniffed out Salazar's two bags from numerous other pieces of luggage. The affidavit asked that a warrant be issued for search of the two pieces of luggage, described in detail.
Defendant contends that the initial stop in Miami was unconstitutional and taints the subsequent stop in New Orleans and that there was no probable cause for issuance of the search warrant. The trial court correctly concluded that the conversation with Detective Johnson in Miami was voluntary on Salazar's part; that the investigatory stop in New Orleans was based upon reasonable suspicion; and that there was probable cause for issuance of the search warrant.
The issues are the legality of the encounter in Miami; the legality of the stop in New Orleans; and the validity of the warrant.
It is clear that the conversation in Miami was not a seizure or invasion of privacy as prohibited by Article 1, Section 5, of the Louisiana Constitution of 1974 and the Fourth Amendment to the Constitution of the United States. There is nothing to show that the conversation between Johnson and Salazar involved a restraint or interference with Salazar's liberty. According to Johnson's testimony at the hearing *1298 on the motion to suppress, Johnson asked Salazar if he had a minute to talk to him, and Salazar answered yes. They did not leave the main area of the airport. The contact did not prevent Salazar from proceeding on his way if he wished to do so, and Salazar subsequently continued to his departure gate. In United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the two justices joining in the opinion of the court held that a similar confrontation was not a seizure. Three concurring justices did not reach the question of whether there was a seizure because it had not been considered by the lower courts, but agreed that there was reasonable suspicion of criminal activity which justified a stop for routine questioning.[2] Here, there was less restraint at the Miami Airport than there was in Mendenhall. In Mendenhall the suspect was not only questioned in the airport proper, but asked to accompany officers to the Drug Enforcement Administration office where she removed her clothing and was searched for narcotics.
It is questionable whether the conversation between Salazar and Johnson constitutes an investigatory stop. A stop, although not a "seizure" in the constitutional sense, is a lesser form of detention. A "stop" involves an element of force or duress, temporary restraint of a person's freedom to walk away. See the concurring opinion of Justice Harlan in Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Louisiana has recognized that a police officer can converse with a citizen without infringing on the citizen's liberty. State v. Shy, 373 So.2d 145 (La., 1979). See the concurring opinion by Chief Justice Dixon in State v. Brown, 370 So.2d 547 at 555 (La., 1979). There is nothing here to indicate that Salazar was detained by Detective Johnson. Salazar was free to leave and did so after their conversation. One policeman talked to one citizen without the use of force or coercion.
If the Miami conversation is characterized as a "stop", it was based on reasonable suspicion of criminal activity. LSA-C. Cr.P. art. 215.1.[3] At the hearing on the motion to suppress, Johnson testified that Salazar was nervous, hurried and apprehensive, stuttering over his name. Salazar checked with National Airlines and then studied a screen posting all flights before booking a flight on Northwest Orient. Yet, he apparently had a reservation with the latter airline. His flight was scheduled to depart at 3:40 P.M. but he did not buy his ticket until 3:25 P.M. Salazar's demeanor, his stutter, his light luggage, Latin appearance, and late arrival all indicated to Johnson that he might be a drug courier.
Mere nervousness does not give rise to a reasonable suspicion of criminal activity. State v. Chopin, 372 So.2d 1222 (La., 1979). Nervousness coupled with the failure to claim one's baggage is also insufficient. State v. Washington, 364 So.2d 958 (La., 1978). Being nervous and black and picking *1299 up one piece of luggage without surrendering a claim check does not give rise to reasonable suspicion. State v. Matthews, 366 So.2d 1348 (La., 1978). A past arrest for possession of heroin, purchase of a ticket with small bills, and a jog to the restroom after a nervous and evasive arrival in New Orleans from Los Angeles are insufficient. State v. Key, 375 So.2d 1354 (La., 1979). However, components of a drug courier profile can be considered with other relevant information in evaluating whether there was a reasonable suspicion of criminal activity. State v. Brown, 370 So.2d 547 (La., 1979). Here, although Salazar arrived late for his Northwest Orient Airlines reservation, he did not, as might be expected, hurry to that airline. Instead, he first approached National and then checked the other flights scheduled from the airport before purchasing his ticket. He stuttered when asked his name. These facts, combined with his nervousness, apprehension and general resemblance to the Miami drug courier profile justified Detective Johnson's approach to Salazar.
The second question is whether the interrogation in New Orleans was based upon a reasonable suspicion of criminal activity. Reasonable cause for an investigatory stop such as that made by the officers in New Orleans is something less than probable cause. State v. Brown, supra. Here, the New Orleans police officers had a detailed description of Salazar from the detective in Miami, certainly a reliable informant. Salazar not only fit certain elements of the drug courier profile in that he appeared nervous and apprehensive, was traveling with limited luggage and was arriving from an area of drug traffic, but, in addition, he was traveling under an assumed name and had given fictitious information both to the airline employees and to Detective Johnson. There was ample evidence for suspicion of criminal conduct.
The third issue is whether the warrant which issued was based on probable cause. Since the affidavit particularly described the two pieces of luggage to be searched and the fact that they had been picked out by Shep, the search warrant was properly issued. Article 1, Section 5, Louisiana Constitution of 1974; LSA-C.Cr.P. art. 162.
For the foregoing reasons, the conviction and sentence of defendant, Ernesto C. Salazar, are affirmed.
AFFIRMED.
DIXON, C. J., concurs.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I disagree with the majority's opinion that the Supreme Court in United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) held that a similar confrontation was not a seizure. As I read the several opinions of the justices, none of which commanded a majority, at least seven justices assumed there was a seizure. See the concurring opinion of Justice Powell, joined by the Chief Justice and Justice Blackmun, ___ U.S. at ___, 100 S.Ct. at 1880, 64 L.Ed.2d at 513; the dissenting opinion of Justice White, joined by Justices Brennan, Marshall and Stevens, ___ U.S. at ___, 100 S.Ct. at 1883, 64 L.Ed.2d at 517. I cannot see how the initial encounter in Miami in this case differs in any significant way from the seizure in Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), where the Supreme Court held that as a matter of law, the agents could not have reasonably suspected that a person who did little more than occasionally glance over his shoulder was engaged in criminal activities.
I respectfully dissent.
NOTES
[1] Conditions of active probation were a fine of $250 plus costs, a visit to Angola, and psychiatric counseling.
[2] In Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) the question was not whether the initial contact was legal, but whether there was probable cause for search of a flight bag dropped by one of two subjects. The three concurring justices noted the similarity to Mendenhall and stated through Justice Powell that their concurrence in Mendenhall did not indicate disagreement on the seizure issue. The concurring opinion points out that Reid v. Georgia does not consider the legality of the initial stop and therefore the state courts should regard that issue in light of Mendenhall.
[3] LSA-C.Cr.P. art. 215.1 provides:

"Temporary questioning of persons in public places; search for weapons
"A. A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.
"B. When a law enforcement officer has stopped a person for questioning pursuant to this Article, and reasonably suspects that he is in danger of life or limb, he may search the outer clothing of such person for a dangerous weapon or for any other thing the possession of which may constitute a crime.
"C. If the law enforcement officer finds a dangerous weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."